## KIMBALL & a. v. LAMPREY & a.

A mandamus is a proper remedy for selectmen to compel the delivery to them of the books and papers pertaining to the office, by persons who are alleged to have usurped the office.

Rev. St., ch. 33, § 4, provides that when any vote declared by the moderator, shall be questioned, &c., the moderator shall make the vote certain, by a poll of the house. Whether, after a vote has been declared by the moderator, and a poll taken to make it certain, another poll may be had, to make the first poll certain, *quære?*

At an annual town meeting, a motion was made that the meeting should adjourn to a day certain. The moderator being unable to determine which way the majority was, by counting the hands, stated that fact to the meeting. A poll of the house was demanded, and tellers were appointed, who reported that the majority was in favor of adjournment, and the vote was so declared by the moderator. It was then moved that the meeting should proceed to ballot for town representative, and the moderator arranged the ballot-box and checklist for that purpose. Before any ballots were given in, the vote declared by the moderator, on the question of adjournment, was questioned by a proper number of voters. *Held* that the business of balloting for town representatives was not "commenced," so as to render it too late to question the vote as declared by the moderator.

Where a poll of the house was had, and tellers were appointed, and the testimony of the witnesses is equally balanced, as to whether a certain person did or did not vote in a certain way, the report of the tellers who returned him as voting one way, is *prima facie* evidence that he voted according to their count, and his own testimony that he did not intend so to vote, is not sufficient to overcome the presumption that he voted as they returned him, and is entitled to no greater weight than that of other persons who testified in relation to his intention and assent.

PETITION for a mandamus.

The petition states the following facts:

The petitioners, Maurice Kimball, Stephen Greene and Ebenezer Lovering, representing themselves to be selectmen of the town of Kensington, allege that the last annual meeting of the town was held on the second Tuesday of March, 1848, and adjourned to the 16th of March. At the adjourned meeting, the petitioners were duly chosen selectmen. The whole number of votes cast for selectmen was sixty-eight. Kimball had sixty-six votes, Greene had sixty-eight, and Lovering had sixty-six. The petitioners were

declared by the moderator, in open town meeting, to be duly elected selectmen, and took the oath of office by law prescribed.

The defendants, Gilman Lamprey, Charles Hilliard and Oliver Clifford, claim to hold and exercise the office of selectmen, and have in their possession a jury-box and several books of records, &c., pertaining to the office, which it is alleged they unlawfully detain from the petitioners, who ought to have the use and custody thereof, and the petitioners prayed that the respondents be commanded to deliver the property to the petitioners.

The respondents were notified to appear and show cause against the petition, and they appeared by their counsel. Evidence was taken by the parties, from which the following facts appeared:

At the annual town meeting in Kensington, in March, 1848, there were two unsuccessful ballotings for the choice of a town representative. A motion was then made that the meeting should adjourn to the then next Thursday, at one o'clock P. M. The vote upon this motion was taken by a "show of hands," but the moderator being unable to determine which way the majority was, by counting the hands, a poll of the house was taken. Tellers were appointed at the two doors of the house. Those in favor of the adjournment were to pass out at the west door, and those opposed to it were to pass out at the east door. The tellers reported eighty-one in favor of, and eighty-four against the motion. Another poll of the house was then demanded, upon the ground that there was either fraud or mistake in the count by the tellers, there being, it was alleged, more votes returned than there were legal voters present. The second poll was then taken, which resulted in a vote of eighty-one in favor of, and eighty against adjournment, and the moderator declared the meeting to be adjourned. At the time specified, at one o'clock P. M., on Thursday, the 16th of March, a portion of the voters assembled, and elected

the petitioners as selectmen for the year 1848. A certain portion of the voters remained in the house, on Tuesday, after the meeting was declared to be adjourned, and chose a new moderator and a board of selectmen, who are the respondents in this proceeding; and the object of this petition is to compel the respondents to deliver to the petitioners the books, records, &c., belonging to the town, on the ground that the petitioners are the legal board of selectmen.

The testimony of Ira Blake, the moderator at the annual meeting, was taken by the petitioners, who testified that the question on the motion to adjourn was taken by a hand vote, but that it was impossible for him to count the hands, and he so declared to the meeting. A poll of the house was then demanded, and two tellers were appointed at each door. Those in favor of the adjournment were to go out at the right hand door, and those opposed to it were to go out at the left hand door. He appointed S. P. Tuck as a teller at the left hand door, and some other person who was opposed to the adjournment. The tellers reported that there were eighty-one persons in favor of, and eighty-four against the adjournment, and the vote was so declared. The vote was disputed by J. T. Blake and others, and another poll was demanded. The moderator then stated that he did not know that he had a right to order a second poll on the same question. J. T. Blake then said he thought there was a mistake in the count by the tellers, because there were more people polled than there were legal voters present, and desired the witness to examine the checklist, who counted the voters thereon, and found it contained one hundred and seventy-six names. He then counted the voters whose names were not checked, all of whom he was satisfied had not been at the meeting, and they were thirteen in number. Deducting these, there would be one hundred and sixty-three names checked. As one hundred and sixty-five votes had been returned by the tellers, he was satisfied that a mistake had been made, and so declared it to

the meeting, and that he should permit another poll to be taken, in order to correct it. He then appointed four tellers, two of each party, to count the voters at the right hand door, and the same number at the left hand door, and directed those in favor of the adjournment to go out at the right hand door, and those opposed to it to go out at the left hand door. The tellers reported that there were eighty-one votes in favor of, and eighty against the adjournment, and in this report they were all agreed.

There were several other witnesses on the part of the petitioners, whose account of the transaction agreed in substance with that given by the moderator.

There was considerable evidence, on each side, upon the question whether the vote on the first poll was questioned before any other business was commenced. It did not distinctly appear how many persons questioned the vote on the first poll, as declared by the moderator. One witness testified that a " good many persons" did so. Another witness could not designate any person but John T. Blake. Another witness testified that three or four persons continued to dispute the poll. There was, however, sufficient evidence to warrant the finding that the vote was questioned by as many as seven persons.

Upon the evidence, a question of some importance arises in this case, in relation to the vote of one Robert Titcomb, who was alleged by the petitioners to have voted for the adjournment. The tellers all agreed that he passed out at the west door, and if he did so, this is strong evidence that he voted for the adjournment. Titcomb himself says that he did not go out at that door. There are two witnesses who say they saw him pass out. He and two other witnesses say that he did not assent to be counted in favor of the adjournment. But there are three witnesses who say that he did assent to be thus counted. There are two witnesses who say they saw him pass out at the west door, and there are two others, who were at the west door, who say

that they did not see him pass out there.    Upon this evidence, the question arises whether he passed out at the west door, and if so, whether he assented to be counted in favor of the adjournment.    As the majority for the adjournment was only one, the question depended upon his vote whether there was or was not an adjournment.

*Wells*, for the respondents.

A mandamus will be refused, if the party has other modes of redress.    2 N. H. Rep. 126.    It lies where there is no other specific remedy for a legal right.    15 East. 117; 6 Johns. 280.    It lies where, without it, justice would be obstructed.    4 Bac. Abr. 497, Title Mandamus.    It is not the proper mode of trying the title of an officer to his office. The remedy is *quo warranto*.    5 Hill 616; 3 Johns. Cases 79.    It is a decisive answer to a petition for a mandamus, that there is another remedy, by a writ of *quo warranto*.    2 Term 259; 4 Bac. Abr. 506; 8 Mod. 98; 5 Com. D. 29, Title Mandamus; 2 Chitty 255; 6 Ad. & Ellis 49.

*Marston* and *Bartlett*, for the petitioners.

The petitioners claim to be selectmen, both *de jure* and *de facto*, and this is their only remedy.    If they had any other adequate and specific remedy, we do not contend that this petition could be sustained.    But a mere civil action would amount to nothing.    Trover or replevin would not lie.    In trover, we could only recover damages, and nothing could be determined within the year.    The authority of the court to issue this writ is sufficiently clear.    R. S., ch. 171, § 3.

A writ of *quo warranto* will not lie against a town officer who is elected for a year only, but a mandamus is the proper remedy.    3 Mass. Rep. 285; Angell on Corp. 565; 20 Pick. 485.    A mandamus is a more efficient remedy to compel the delivery of records to the proper officer.    21 Pick. 151.

We ask, in substance, to remove persons who have usurped offices to which they are not entitled.

GILCHRIST, C. J. There are numerous authorities tending to show in what cases a writ of mandamus is the appropriate remedy. In the case of the *Commonwealth* v. *Athearn*, 3 Mass. Rep. 285, it is intimated by *Parsons*, C. J., that the proper mode is for the successor of a town clerk to take the oath of office, and to demand of the former clerk the records, and if they are refused, then to move for a mandamus to command him to deliver over the records. It was alleged, in that case, that the defendant was in possession of the office, but was not so legally. In the *First Parish in Sudbury* v. *Stearns*, 21 Pick. 148, trover was brought against the defendant for the book of records of the parish. His defence was that he was the clerk, and as such had a right to the possession of the records. *Morton*, J, says: " A mandamus would doubtless be a more appropriate and effectual remedy to compel the delivery of the records to the legal officer," and he cites the case of the *Commonwealth* v. *Athearn*. The rights of persons acting *colore officii* can be tried only in an information in the nature of a *quo warranto*, or on a writ of mandamus. Ibid. 156.

In *Rex* v. *Wildman*, 2 Strange 879, the reporter says: " A mandamus was granted to Wildman on my motion, requiring him to deliver the Company of Blacksmiths all books, papers, &c., which he had in his custody, by virtue of being their clerk, from which office he had been removed." . In the *King* v. *Ingram*, 1 W. Bl. 50, there was a motion for a mandamus to deliver up books and papers belonging to the borough of Droitwich. *Bathurst* showed for cause that Ingram was executor of Mr. Winnington, who had laid out several sums for the borough, and had never been repaid, and that he kept these books as a security for such repayment; but the court said that, as he confessed to having public books in his custody, a mandamus must go, and if he had

any just cause for keeping them, he might set it out in the return, and a mandamus was granted.

A mandamus suggested that the defendant was surveyor of highways for a time named, and now expired, and that divers books of accounts, &c., relating to the highways during his time of office, were now in his possession, and ought to be delivered to the church wardens, and that he had often been requested so to deliver them, and had refused, and a mandamus commanded him to deliver to the church wardens all books, &c., in his possession, or show cause to the contrary. *The King* v. *Round,* 4 Ad. & Ellis 139. So a mandamus may issue on the petitioner proving himself to be town clerk, to his predecessor, commanding him to deliver to the petitioner the books of records, &c., belonging to the office. *Taylor* v. *Henry,* 2 Pick. 397.

A mandamus issued to the defendant, commanding him to deliver to the plaintiff the common seal, &c., of Harwich, which the plaintiff claimed to belong to his custody, as having been duly elected town clerk of that corporation. *Crawford* v. *Powell,* 2 Burrow 1013. A mandamus was granted to oblige the old overseer of the poor to deliver over the books of the poor rates to the new overseer, for, *per curiam,* they are public books, and ought to be delivered over by one overseer to another, that the parishioners may have access to them, and the overseer and church wardens for the time being ought to have the custody thereof. *Rex* v. *Clapham,* 1 Wils. 305; 3 Bl. Com. 310. In the case of *Shipley* v. *The Mechanics Bank,* 10 Johns. 484, a mandamus was refused to the defendants, commanding them to permit certain shares to be transferred, on the ground that they had an adequate remedy by an action on the case, to recover the value of the shares. It is said by the court, "it is not a matter of public concern, as in the case of public records and documents." In the case of *The People* v. *Throop,* 12 Wend. 188, the doctrine laid down is that where a rule to show cause has performed the office of an alternative writ,

there is no impropriety in granting a peremptory mandamus in the first instance. The same matter has now been presented to the court, by affidavit, which would have come in the shape of a return to an alternative mandamus. A delay might render the whole proceeding nugatory as to the relater.

Upon these authorities, and there are numerous others to the same effect, the judgment of the court is that a mandamus is the proper remedy in this case.

But the case raises several other questions of considerable importance.

The Rev. St., ch. 33, § 4, provide as follows:

" When any vote declared by the moderator shall immediately, and before any other business is commenced, be questioned by seven or more of the voters present, the moderator shall make the vote certain by a poll of the house."

It has been a matter of inquiry by us whether, after having taken one poll of the house, the result thus attained was not conclusive, so as to preclude another poll of the house to make the vote certain upon the first polling. That question it is unnecessary to decide at present. The first poll of the house was not taken upon " any vote declared by the moderator," but it was taken because he could not arrive at any certain result by counting the hands. Upon the question of adjournment, the first vote declared was the vote ascertained by the first poll. Now the moderator might as well have taken the vote by tellers in the first instance as by a show of hands. There is nothing in the statute to prevent it, and the third section of ch. 33 provides that he " may prescribe rules of proceeding." He could not determine how the vote was, by counting the hands, and therefore the house was polled, upon his statement of the difficulty. The statute, by its express terms, applies only to cases where a vote " declared by the moderator" shall be questioned. The only vote declared by the moderator was that upon the first poll of the house, where

there were eighty-one votes for, and eighty-four votes against the adjournment. The first poll was the first vote taken, and that undoubtedly might be made certain by a second poll, which was the first attempt to make certain a previous vote. But whether, after a vote has been declared by the moderator, and a poll taken to make it certain, another poll may be had to make the first poll certain, is a question that need not be settled here.

But it is objected by the defendants, that the vote upon the first poll was not questioned immediately, and before any other business was commenced. Upon the evidence in relation to this point, the inquiry is, whether any other business had been commenced when the second poll was begun.

The evidence on the part of the respondents tends to prove that when the result of the first poll was declared by the moderator, a motion was made and seconded, to proceed to a third ballot for town representative. The moderator said that this motion was in order, and directed the people to bring in their ballots. He took the ballot-box, placed it in a convenient situation to receive the votes, took the checklist, opened it, and appeared ready to call the names of the voters, some of whom, with votes in their hands, were gathered round the desk, ready to vote when their names should be called. Then the vote declared by the moderator upon the first poll was questioned by John T. Blake and others. Three of the respondents' witnesses, the only persons in the case who speak upon this point, state that the moderator had not called any names from the checklist, when the vote upon the first poll was questioned. Another witness said the moderator was *about commencing* to call it, when the objection was made.

This is as far as the respondents' evidence goes, and taking it to be all true, what does it prove ?

After the declaration of a vote according to the first poll, the " business" next to be " commenced" was the

third balloting for a town representative. It was moved and seconded that the meeting should proceed to this business. The moderator declared the motion to be in order, and called on the people to bring in their ballots. It does not appear that the question on this motion was put by the moderator. Now it is evident that no other *business* was *commenced.* There had been only a proposition to commence it, and the moderator called on the people to do so. But the *business* before the meeting was the balloting, and the balloting was not commenced. No ballot had been cast, and no names had been called. The evil which the statute intended to avoid did not exist. The object of the statute was to prevent the confusion which would follow, if, after the meeting was employed in any business, that should be dropped, and some former vote taken up and enquired into. But here no business had been commenced, for there was no balloting to be broken off by examining the former vote.

If the accounts of this transaction given by the witnesses for the respondents be all correct, still, as they do not establish the fact that any other business was commenced, the vote declared by the moderator upon the first poll, which was the first vote declared, must be considered as questioned in sufficient season.

Whether, on the first poll, any persons voted without right, it is not material to determine. It is the second poll that settles the question, and upon that the meeting was either adjourned or not adjourned. But the weight of evidence is that there was no illegal voting.

As to Titcomb's vote, the tellers were all agreed as to his vote at the time. This raises a presumption that his vote was properly included among those who voted for the adjournment, because they agreed upon a matter which they understood better then, while the matter was recent, than at any subsequent time. He was seen to pass out at the west door, by some persons, and others who were present did not see him. *Cæteris paribus,* the oath of one who says he saw

Kimball *v.* Lamprey.

a thing done, is more reliable than the oath of another who was present and did not see it. It does not follow that it did not happen, because he did not see it; and this is particularly true, when we consider the confusion and want of order and inability to understand what is done, which usually prevail in town meetings.

But it is agreed by all the tellers that Titcomb's vote was counted. The respondents deny that he intended to have his vote counted for the adjournment. Titcomb himself, and two other witnesses, say that he did not assent to be counted. Three witnesses on the other side say that he did thus assent. Here are three witnesses on each side. Titcomb's evidence on this point is no better than that of any other eye or ear-witness. We must judge of his assent by the external indications he gave of it, and we do not feel authorized to say that the evidence is sufficient to prove that Titcomb's vote was improperly counted in favor of the adjournment. The meeting was, upon the face of the proceedings, formally and properly adjourned. The report of all the four tellers was *prima facie* correct. The presumption is that the report was right. This presumption must be overcome by evidence, and the evidence is not sufficiently strong for that purpose.

The judgment of the court is that the meeting was properly adjourned, that the petitioners were legally elected selectmen for the year 1848, and that they are entitled to a
*Peremptory mandamus.*