ORFORD UNION CONGREGATIONAL SOCIETY $\{$ June 15, 1875.

*v.*

WEST CONGREGATIONAL SOCIETY OF ORFORD.

*Public charity—Construction of deed—Pleading.*

S., by deed, conveyed certain land to the selectmen of the town of Orford by name, and their successors in said trust, for the use of the inhabitants of said town, for the sole and express purpose of aiding and supporting the gospel ministry within the same, " which lot of land is ever to remain to the said inhabitants for the sole use and purpose aforesaid, the rents of which annually shall be expended by the said inhabitants for the support of the gospel as aforesaid, and for none other purpose or uses," with the proviso, that, if the inhabitants of the town shall hereafter separate and divide into two separate parishes or societies, in that case the rents and profits arising therefrom shall ever thereafter be appropriated to and for the use and support of the gospel at the meeting-house on the river road in said Orford, for the sole use and benefit of the inhabitants of said river parish or society, under the direction of wardens or other officers that may be appointed from time to time by the inhabitants of said parish or society." "To have and to hold the aforenamed and described premises, with all the appurtenances hereto, unto the aforenamed selectmen and to their successors in office, to and for the several uses and purposes aforesaid, for the said inhabitants, to their use and behoof forever." *Held*, that the use was executed in the town of Orford, which became trustee for the purposes expressed in the deed.

The plaintiff society was legally organized under the act of 1819, and assisted in supporting preaching, in connection with the church formed in 1770, to the present time. Some difficulties having grown up in this society, a council of neighboring ministers, having been called in 1832, recommended the dividing the Congregational people into two distinct parishes, and in 1832 the defendant society was legally organized under the act of 1827. This society, and a new church formed in connection with it, and of the same faith and order as the old one, built their meeting-houses on the river road, and have maintained stated preaching there ever since, and elected wardens who have served every year. *Held*, that the defendant society was entitled to the benefit of the trust property, and that it was the duty of the town to permit it to receive the rents and profits.

A bill in chancery having been filed in the superior court for Grafton county, at the July term, 1835, in favor of the present defendants, in relation to this trust, was dismissed. *Held*, that the attorney-general not having been made a party in that suit, the judgment was not binding.

The two societies having made a compromise in 1838—*Held*, that no such compromise effected by said societies could be of any force.

The court found and reported the following case:

In August, 1770, a church was formed in the town of Oxford, which has continued to the present time, in connection with which church the parish or society have supported religious services and worship. Under the law of 1791, authorizing towns to support the ministry by direct taxation, the town of Orford supported the ministry in connection with this church; and, so far as appears, there was no other church in the town or parish until after the act of 1819, which repealed the law of 1791, and only authorized religious societies to support the ministry. This church was Congregational in polity, and in doctrine was what is known as orthodox from the beginning, and so continues to the present time. This church had its meeting-house and regular meetings in the centre of the town, at the village now known as Orfordville or East Orford, said village and meeting-house being about three miles east from Connecticut river, and what was then (in the year 1800) and is now known as the river road, which runs north and south through said town near to said river. In the year 1800, one widow Anna Spooner conveyed to the selectmen of the town of Orford, in trust, a lot of land by deed as follows: "Know all men by these presents, that I, Anna Spooner, of Orford, in the county of Grafton and state of New Hampshire, widow, for the consideration of the esteem, affection, and good will that I continue to have for inhabitants of the town of Orford, together with a real desire and wish that part of my real estate shall be appropriated for the use and support of the gospel ministry in the town of Orford aforesaid as an encouragement to the inhabitants to support the same with respectability, and further as an evidence to the inhabitants that I still retain a grateful sense of the respect and attention that has ever been expressed and paid to me by the said inhabitants while a resident among them,—with the small consideration of one dollar to me in hand paid before the delivery hereof, by Nathaniel Rogers, Jeremiah Marston, and Solomon Mann, selectmen for the town of Orford aforesaid, the receipt whereof I do hereby acknowledge, have given, granted, released, conveyed, confirmed, and by these presents give, grant, alien, release, convey, and confirm unto the said Nathaniel, Jeremiah, and Solomon, and to their successors in said trust, for the use of the inhabitants of said town, for the sole and express purpose of aiding in supporting the gospel ministry within the same, one river or fifty-acre lot of land in the town of Orford aforesaid, drawn to the original right of Joshua Lane, Jun'r, numbered fifty-six, which lot of land is ever to remain to the said inhabitants for the sole use and purpose aforesaid, the rents of which, annually, shall be expended by the said inhabitants for the support of the gospel as aforesaid, and for none other purposes or uses. Provided, however, and this deed is given on this express condition, that if the inhabitants of the town shall hereafter separate and divide into

two separate parishes or societies, that in that case the rents and profits arising therefrom shall ever thereafter be appropriated to and for the use and support of the gospel at the meeting-house on the river road in said Orford, for the sole use and benefit of the inhabitants of the said river parish or society, under the directions of wardens or other officers that may be appointed from time to time by the inhabitants of the said parish or society." " To have and to hold the aforenamed and described premises, with all the appurtenances hereto, unto the aforenamed selectmen and to their successors in office, to and for the several uses and purposes aforesaid, for the said inhabitants to their use and behoof forever." This deed was dated July 26, 1800, and was duly executed, witnessed, acknowledged, and recorded.

The plaintiff offered in evidence, from the records of the town, several votes of the town directing the selectmen to lease this lot of land for one year or more at a time. Such votes were passed in 1801–5, and in 1808, 1814, 1815, and 1822, in which last year the town, upon an article in the warrant for that purpose, "Voted unanimously, that it is not expedient to divide the town of Orford into two separate parishes." (Whole number of votes 134.) In 1835, upon an article in the warrant, it was "Voted, that the selectmen divide the money received for the use" of this Spooner lot " equally among all the religious societies formed in this town, as the law prescribes;" and in 1845 the town voted to allow the selectmen to lease a portion of this lot sufficient for a railroad track, by consent of the religious societies in Orford interested.

On April 13, 1820, John Mann and 143 others associated themselves together, and formed the " Orford Union Congregational Society," under the act of 1819. This society was duly and legally organized, and has kept its records and held its annual meetings regularly to the present time. This society has assisted in supporting preaching in connecttion with the first church, that formed in 1770, to this time. In 1832, one Deacon Dewey, and other members of this church, set up and attended a separate meeting on the river road. Complaints were made of this proceeding, and a council was called for advice of the neighboring ministers, and Rev. Messrs. McKean, Blake, and Wood were present, and the record shows that " the expediency of dividing the Congregational people was laid before the council; also, the matter of grievance against Dea. Dewey, and the other brethren on the river who had taken similar steps with him." The council recommended the dividing of the Congregational people into two distinct parishes, so as to have preaching constantly at the river and also in the central or eastern part of the town ; and that this step was exceedingly desirable, and ought to be done in case it can be sustained. The other difficulties were satisfactorily adjusted.

In 1833, James Dayton and forty-six others associated themselves together, and formed the " West Congregational Society in Orford," under the act of 1827. This society was duly and legally organized, and has kept its records and held its annual meetings

regularly to the present time. At the time this society was formed, there was a new church also formed in connection with it, but of the same faith and order as the old one. This church and society built their meeting-house on the river road, so called, in said Orford, and have generally maintained stated preaching therein ever since, as has the Union society, in connection with the old church, in their meeting-house at Orfordville. The new society have elected wardens, who have served every year since its formation. The new society immediately took measures to secure the rents of this lot of land, and various committees were appointed by both societies to confer with each other in reference to the same, from 1833 to 1835 inclusive, in which last year the West society instructed their executive committee or wardens to make another demand upon the selectmen for the rents of said lot, and, if not paid, " to commence a suit against said selectmen of Orford for the recovery of the rents due for the Spooner lot, so called." Accordingly a bill was entered in the superior court of judicature, in Grafton county, July term, 1835, in favor of the *West Congregational Society in Orford* v. *The Town of Orford*, in relation to the rents of this lot of land, which was continued from term to term until 1837, when the same was dismissed. In 1838, each society chose a committee to confer with a committee from the other society, and each committee was authorized by its society to compromise the matter of these rents by dividing them equally between the two societies. These committees met, and agreed upon and signed the report set forth in the bill, and the two societies assented to the same; and the rents were so divided until the year 1870, since which said selectmen refuse to pay any of said rents to said Union society. Both societies have got wood from this lot for the use of their meeting-houses; and one year some of the timber blew down, and it was sold for about $250, and the proceeds divided equally between the two societies. This sale and division were made by concurrent votes of both societies.

The plaintiffs offered to show that a society of Universalists was formed in the year 1830, or soon after, and built their meeting-house on said river road near to the house of the West Congregational society, and that they sustained preaching in their meeting-house for some fifteen years, but that recently the house was not used except occasionally; but it did not appear that said society had ever claimed or was now claiming any of the rents arising from this land. The defendants moved to dismiss the bill, &c., as in answer.

The questions of law thus raised were reserved at the trial term.

*Lang* and *Carpenter*, for the plaintiffs.

*Felton*, *Pierce*, and *H. Bingham*, for the defendants.

CUSHING, C. J. The case of the *Attorney-General* v. *Dublin*, 38 N. H. 459, was originally commenced in the name of *Abbot et al.* as plaintiffs. A demurrer having been filed on the ground that the

attorney-general should have been made a party, the bill was amended. The same objection, if taken here, would probably have been sustained, and the attorney-general must have been made a party, either plaintiff or defendant. It is obvious that the subject-matter of this suit being a public charity, no final and conclusive settlement can be made unless the state should be represented. Story's Eq. Pl., secs. 8, 49, 69, 222.

It is clear that neither the town of Orford nor the societies have such an interest in the fund as gives them the power to settle anything conclusively in regard to it. The above-mentioned suit, which is reported as "*The Attorney-General, at the relation of Abbot et al.,* v. *The Town of Dublin et al.,*" is a conclusive authority on this point, the object of that suit being to settle the conflicting claims of different religious societies to a charitable fund given for religious purposes.

Assuming that the amendment has been made, and that the attorney-general has become a party defendant, I shall proceed to examine the questions that arise in the case.

The first question is in regard to the grantees in the deed of Mrs. Spooner, and the kind of estate taken by them. The gift is to three individuals, by name, described as selectmen of Orford, and to their successors in said trust, which I suppose means their successors in said office, the word "office" being substituted for the word "trust" in the *habendum* of the deed. It is evident that the intention of the donor was to convey a fee, and the declaration of the uses is to the inhabitants of said town, ever to remain to the said inhabitants for the sole use and purpose, &c.

There is nothing for the original grantees to do—no reason why the estate should remain in them; and it appears to me that the use is executed in the town, so that the fee of the land is vested in the town as trustee. The trust declared is, that the rents shall annually be expended by the said inhabitants for the support of the gospel, &c., and with a further provision, "that if the inhabitants of the town shall hereafter separate or divide into two separate parishes or societies, in that case the rents and profits arising therefrom shall ever thereafter be approriated to and for the use and support of the gospel at the meeting-house on the river road in said Orford, for the sole use and benefit of the inhabitants of the said river parish or society, under the direction of wardens or other officers that may be appointed from time to time by the inhabitants of the said parish or society."

It appears from the case that there now exist in Orford two Congregational societies, who are supporting substantially the same form of Congregationalism as appears to have been contemplated by the founder of the trust. These societies appear to be regular organizations under the statutes of New Hampshire. It is not expressly averred, but I think it may be presumed, that these societies are voluntary so far that they are open to all persons desiring to associate with them, and I think there can be no reasonable doubt but that they embrace as members all the inhabitants of Orford who desire to worship according to that form of Congregationalism. *The Dublin case,* 38 N. H. 574.

If the inhabitants of Orford are not now divided into two separate parishes or societies, it is difficult to conceive of any way in which it can be done. This being so, it would seem to follow that the town of Orford, as the trustee, is bound to permit the rents and profits of this land to be applied by the wardens of the defendant society to the support of religious worship according to the terms of the deed, unless, by reason of something suggested in the bill, that consequence is prevented.

Now, it is said that a suit has been commenced in favor of that society against the town of Orford, which has been dismissed on demurrer. It is not directly claimed in the bill that the rights of these defendants have been concluded by that proceeding. There is no such precise statement of the allegations in that bill as would enable the court to find that the parties were estopped by the judgment.

If, however, there were such allegations, their effect would be entirely obviated by the fact that the attorney-general was not made a party to that bill, and therefore cannot be bound by its result. It seems equally certain that nothing could be done by these societies, by way of compromise or agreement, which could be conclusive. We are not now concerned with the past administration of the fund. The question we have to determine is, What shall now be done with it?

Under the law of 1791, and as it remained until 1819, when Dr. Whipple's toleration act,* as it was called, was passed, towns had the

---

\* This act, though now moss-grown and nearly forgotten, marked an era in the religious and political history of the state. It was popularly called " Dr. Whipple's Act," &c., because Dr. Whipple, the member of the House from Wentworth, was the author of its most vital provisions, or, to use his own words in the great debate, " as the amendment [offered by him] contained the most essential provisions of the bill, from which either harm or benefit might result," and because, to use the words of the most eminent journalist of New England, "it was sustained by the mover with unrivalled ability and eloquence."

The legislature, on February 8, 1791, passed "An act for regulating towns and the choice of town officers." It was very lengthy, and provided for the perambulation of town lines, for the choice of numerous town officers, the appointment of others, the filling of vacancies, the passage of by-laws, the warning of town-meetings, and prescribed the duties of a great variety of town officers, and the mode of service of legal processes upon towns and other corporations, &c.

The tenth section was as follows: "*And be it further enacted*, That the inhabitants of each town in this state, qualified to vote as aforesaid, at any meeting duly and legally warned and holden in such town, may, agreeably to the constitution, grant and vote such sum or sums of money as they shall judge necessary for the settlement, maintenance, and support of the ministry, schools, meeting-houses, school-houses, the maintenance of the poor, for laying out and repairing highways, for building and repairing bridges, and for all the necessary charges arising within the said town, to be assessed on the polls and estates in the same town, as the law directs."

The amendment to this act, out of which "the toleration act" grew, was introduced in the senate in 1819. The journal of the senate gives no clew to its authorship, but shows that, on June 14, 1819, "A bill entitled 'An act in amendment of an act entitled an act for regulating towns and the choice of town officers, passed February 8th, Anno Domini 1791,' having had three several readings, passed to be enacted. Sent down for concurrence."

On June 22, 1819, in the house, Dr. Whipple proposed the following amendment:

power to raise money for the support of the ministry, and in so doing they would naturally have the regulation of the support of public worship in their power. It may be that during that time the town could by its vote have divided itself into two societies, and might have provided for the maintenance of public worship in that form, and under such circumstances a vote of the town that it was not expedient to form two societies might have some significance. But by the toleration act, the power of raising money by taxation for the support of the ministry was taken away from the towns, excepting in so far as was necessary for the fulfilment of contracts then existing.

Under this law, it appeared in the *Dublin case* that a religious society had been organized in Dublin, composed principally of those who had formerly composed the religious society under the town organization, and connected with the same church, and who had continued to support the ministry in connection with that church till the commencement of the suit. It was held by the court that that society was entitled to the benefit of the funds which the town held in trust under the will of Mr. Sprague. In the same way, the plaintiff society was undoubtedly well entitled to the benefit of the fund which is the subject-matter of this suit, so long as that continued to be the only society in Orford.

But when a council, held, as we must understand, according to the usages of the Congregational polity, had recommended a division of the society, and in pursuance of that recommendation the defendant society had been formed, it seems that undoubtedly the division into two

"*And be it further enacted*, That every religious sect or denomination of Christians in this state may associate and form societies, may admit members, may establish rules and by-laws for their regulation and government, and shall have all the corporate powers which may be necessary to assess and raise money by taxes upon the polls and ratable estate of the members of such association, and to collect and appropriate the same for the purpose of building and repairing houses for public worship, and for the support of the preaching of the gospel; and the assessors and collectors of such associations shall have the same powers in assessing and collecting said moneys, and shall be liable to the same penalties, as similar town officers now have and are liable to: *Provided*, That no person shall be compelled to join or support, nor be classed with or associate to, any congregation, church, or religious society, without his express consent first had and obtained. *Provided, also,* If any person shall choose to separate himself from such society or association to which he may belong, and shall leave a written notice thereof with the clerk of such society or association, he shall thereupon be no longer liable for any future expenses which may be incurred by said society or association."

The amendment was opposed by Pitman of Portsmouth, Parker of Amherst, and Hubbard of Charlestown. It was supported by Butters of Pittsfield, and Ichabod Bartlett of Portsmouth, Dr. Whipple opening and closing the debate. It was carried,—yeas 96, nays 88. Another amendment proposed by Dr. Whipple was adopted, and the bill was ordered to a third reading,—yeas 95, nays 88. Toppan's motion to postpone to the next session was negatived,—yeas 79, nays 103.

After the adoption of the Whipple amendments, Hubbard voted for the bill. See Journals of the House and Senate for 1819; Barstow's History of New Hampshire 424, 425, 430, 431, 433, 435; *ib.*, 422, 423, 426, 427, 428, 429, 432, 434, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445; *New Hampshire Patriot and State Gazette,* 1819, June 29, July 6, 13, 20, 27, August 3, 10; and all the articles by Gracchus and Alcibiades, and the *Baltimore Register* by Niles.　　　REPORTER.

societies contemplated in the will of the donor had been effected, and the town thereafter should have given to that society the benefit of that fund.

There is nothing in the present case that calls for an inquiry into the manner in which the fund has been administered heretofore, so that whatever appears in the bill on that subject need not be considered now.

This is, in fact, a public charity. It cannot be controlled or its funds diverted from their original purpose by any parties claiming to be the beneficiaries.

The result, therefore, is, that the defendant society is rightfully receiving the rents and profits of this land, and it will be the duty of the town to permit them to continue to do so, and to prevent any other society or person from interfering with the land, or taking anything from it; and the bill must be dismissed.

LADD, J. (1) The trust created by the deed is a charitable use. (2) The establishment of the West Congregational Society in 1833, under the circumstances shown, was a separation, and division, in fact, by the inhabitants of the town "into two separate parishes or societies," within the fair interpretation of the condition in the deed. (3) Being a charitable use, the beneficiaries for the time being could not divert the income by agreement or arbitration. The result of these three propositions is, that the bill must be dismissed.

SMITH, J. By the establishment of the West society, "the inhabitants of Orford separated and divided into two separate parishes or societies," within the meaning of the deed. There is nothing in the language of the deed that requires such separation to be by vote of the legal voters in town-meeting duly warned and held, or by vote of its inhabitants ascertained in some other mode, if that term includes others besides legal voters. No method being pointed out in the deed by which a separation or division of the inhabitants is to be ascertained, I am of opinion that the inhabitants became separated and divided by the establishment of the West society, and consequently that the rents and profits arising from the land conveyed by the deed should be appropriated for the use and support of the gospel at the meeting-house occupied by the West society on the river road.

The trust being a charitable use, the beneficiaries cannot alien it, for the property is not theirs to sell; nor donate it, for the title is not in them; nor misapply the funds, because the use and trust for which it was created cannot be diverted. They are bound to apply the income according to the terms and conditions imposed by the donor. The compromise or agreement of 1838, by which the income was divided between the two societies, was a diversion of the property from the terms of the trust, and consequently cannot be enforced. The West society is entitled to the whole income.

*Bill dismissed.*