March 21,
1876.                    HILL *v.* GOODWIN.

*Mandamus—Elections—Correction of town records—Government of town-meetings.*

It is the duty of a town-clerk to record the votes as publicly declared by the moderator. His duty in this respect is purely ministerial.

A writ of mandamus will issue to compel a town-clerk to record the proceedings of a town-meeting, as publicly declared by the moderator;—also, to correct his record to conform to such declaration.

The moderator has the power to prescribe rules for the government of the meeting over which he presides, subject to be altered by the town. The rules of parliamentary law (so called) are not in force for the government of town-meetings, except so far as prescribed by the moderator, subject to alteration by the town.

HILLSBOROUGH COUNTY.

PETITION, for a writ of mandamus, filed by ten of the inhabitants and legal voters of the town of Mason, complaining that the defendant, who is town-clerk of said town, omitted to record the proceedings of the annual meeting, held in the afternoon of March 9, 1875, and that the record, as made by him, of the proceedings in the forenoon is incorrect, and praying that he be commanded to amend his record to correspond with the facts. The answer of the defendant admits that he

omitted to record certain proceedings that took place in the afternoon, for the reason that the adjournment in the forenoon was illegal, and therefore that no legal meeting was held in the afternoon ; and by reason of certain other irregularities alleged to have taken place. The facts sufficiently appear in the opinion of the court.

*Wadleigh & Wallace*, for the petitioners.

*Cross & Burnham*, for the defendants.

SMITH, J.  A very large amount of testimony has been taken in this case, much of which is conflicting.  I have endeavored to consider the same with all the care the importance of the case demands.  The facts are these :

The annual meeting in Mason, on the second Tuesday of March, 1875, was duly warned.  John S. Spaulding, one of the petitioners, was elected moderator, and acted as such.  Daniel Goodwin, the defendant, was elected town-clerk, and accepted the office.  Agreeably to a vote, Article 2 was taken up, and the meeting proceeded to vote for state and county officers.  After most of the voters had thrown their ballots, a discussion arose whether to proceed to the choice of representative under Article 4, or selectmen under Article 3.  Several motions were made without being put to vote.  Considerable time was consumed in the discussion of what had been the practice of the town in years previous, when a new motion to proceed to the election of selectmen was made and declared carried.  The meeting then commenced to vote for first selectman.  A few votes had been thrown, when a motion was made and adopted to use the check-list in voting for first selectman.  Whereupon the ballot-box was emptied of the votes that had been cast, and a new balloting commenced, the clerk checking the names of those voting.  When some fifteen or twenty votes had been thrown, the clerk inquired of the moderator whether persons had not voted whose names had not been checked.  He also informed the moderator he could not check the names of those voting unless better order was preserved ; and soon he declined to check any more names, alleging as a reason that he could not do it on account of the disorder.  The moderator thereupon informed the meeting that the clerk refused to check the names of those voting.  A motion was then made to adjourn, which was defeated.  The motion was immediately renewed, and again defeated.  Immediately a motion was made to adjourn to 2 o'clock P. M., which was adopted, and an adjournment took place till that hour.  No new business was introduced or transacted between these motions to adjourn.  It is a controverted question whether the meeting was disorderly while the voting was going on, and a good deal of evidence has been taken upon this point.  Many witnesses on the part of the defence testified that the noise and confusion were very great, occasioned by several persons attempting to speak at the same time, and by the rush of voters about the hall and to the desk to

deposit their votes; and that one of the speakers, while addressing the meeting, was hissed by one or more of the audience. An equal number of witnesses for the plaintiffs testified that there was no more disturbance than usual on such occasions, and that there was no difficulty in readily and properly transacting the business of the meeting. Any attempt to 'reconcile this evidence, or to arrive at the exact truth, is attended with difficulty; but the evidence, upon the whole, seems to point to the conclusion that there was no such confusion or disturbance as to obstruct the business of the meeting. There is no evidence from any of the witnesses that any violence or force was used or offered, or that any intimidation of voters was attempted, or anything said or done that prevented the full and free action of the voters. The evidence fails to show that there was such disorder or confusion as justified the clerk in refusing to check the names of those voting.

The meeting was called to order at two o'clock in the afternoon, by the moderator. Here again the evidence is conflicting, the witnesses for the defence testifying that the ballots thrown for first selectman before the adjournment were not taken from the box, nor any information given the meeting why the balloting proceeded without using the check-list. On the other hand, witnesses for the plaintiffs testify, with equal positiveness, that the moderator informed the meeting that the balloting must proceed without the check-list, because of the refusal of the clerk to check the names; and that thereupon the ballot-box was emptied of the votes thrown before the adjournment, and a fresh balloting for first selectman commenced. All the witnesses do, however, agree, that no objection was made by any one to proceeding without using the check-list, and that the town-clerk and selectmen made no remark or explanation upon the subject to the meeting. "*Ceteris paribus*, the oath of one who says he saw a thing done, is more reliable than the oath of another who was present and did not see it. It does not follow that it did not happen because he did not see it;—and this is particularly true, when we consider the confusion and want of order, and inability to understand what is done, which usually prevail in town-meetings." GILCHRIST, C. J., in *Kimball* v. *Lamprey*, 19 N. H. 215. Upon weighing the whole evidence, and sifting it as well as it is possible to do, it appears to be more probable than otherwise that the witnesses are not mistaken who testify that the moderator did inform the meeting in the afternoon that the clerk refused to check the names of the voters, and that the moderator thereupon emptied the ballot-box of the ballots thrown before the adjournment.

The balloting for first selectman thereupon commenced for the third time, and proceeded without the use of the check-list, without objection from any source, and without disturbance, and resulted in the choice of John S. Spaulding. Hiram D. Richardson and Luther A. Blood were elected second and third selectmen, respectively. Messrs. Russell and Barrett, of the old board, and the clerk, did not vote, and refused to assist the moderator in sorting and counting the votes, and the clerk declined to make any record of the proceedings. The votes

for state and county officers were then sorted and counted, the old board of selectmen and clerk aiding therein ; and the result was publicly declared by the moderator, and recorded by the clerk. A motion was then made to adjourn, and voted down. The motion was immediately renewed, and again voted down. The motion was again made, when the moderator inquired " To what time ? " One person cried out, " To the 4th of July ; " another, " To 9 o'clock this evening ; " and a third, " To 9 o'clock to-morrow morning." The moderator stated the motion to be " to adjourn to 9 o'clock to-morrow morning," put the same to a vote, and declared it carried, and pronounced the meeting adjourned to nine o'clock of the next forenoon. The vote was not questioned. Russell and Barrett were present during the whole day, in the desk occupied by the moderator and town-clerk. Dana D. Goodwin, the third member of the old board, and son of the defendant, was absent from the state.

During the evening of the ninth of March, Russell, Barrett, and Goodwin took down, or caused to be taken down, the copies of the warrant and check-list posted at the town-house and post-office, being the only copies in existence. The same evening Russell and Barrett posted a warrant for a meeting, to be held March 27, to transact the usual town business, except that no article for the choice of town officers was inserted. The town-house was locked by the selectmen, and the warrant and check-list taken by Goodwin to his house, and the keys left there with his son Charles, with instructions not to deliver them to any person except upon the order of the selectmen. On the morning of March 10, Goodwin went into the state of Massachusetts, and remained till night. Russell and Barrett remained away during the day, in another part of the town, two or more miles from the town-house. At the hour of nine o'clock, or soon after, the voters assembled at the town-house, according to adjournment, but found the door locked. The moderator, with Richardson, went to the house of Goodwin, in the immediate vicinity, for the keys, check-list, and warrant ; and the moderator requested the keys of Goodwin's son, who was a voter, which he refused to surrender. A window of the town-house was then raised, through which entrance was gained, and the bolt of the door removed. The voters then entered, and the moderator called the meeting to order. The evidence is conflicting as to the time the meeting was opened,—young Goodwin and another son of the defendant testifying that it was from fifteen to twenty minutes past ten o'clock when the moderator came for the keys, while two other witnesses testify with equal positiveness that it was from fifteen to twenty minutes before ten when the meeting was opened. Considering the situation of the witnesses, their means of knowing the time of day, and their motives and interest to mistake or misrecollect it, it appears more probable than otherwise that the latter witnesses are correct in their recollection that the meeting was opened before ten o'clock. James O. Reed was chosen clerk *pro tempore* by ballot, and sworn. John S. Spaulding and Hiram D. Richardson, before the meeting was called to

order, took the oath of office before James Taft, a justice of the peace, who made a certificate of that fact. Spaulding acted as moderator, and Richardson was present in the desk as selectman. Blood declined to serve as selectman, and was excused. A ballot was taken for representative. The whole number of votes cast was eighty-three. John B. Hill had twelve, and John S. Spaulding had seventy-one, and was declared elected. A ballot was then taken for third selectman. Whole number of votes, seventy-five. George Whittaker had thirty-nine, all others thirty-six,—and George Whittaker was declared elected, and, being present, appeared before the moderator and took the oath of office. The meeting was then dissolved. Neither the warrant nor the check-list, nor a copy of either, was present at the meeting on the tenth of March.

The new board of selectmen subsequently called a meeting, to make the annual appropriations and complete the business of the town ; but the warrant was taken down by the old board, and the meeting never was holden.

At the meeting called to be held on the twenty-seventh of March by the old board, John B. Hill was elected moderator, and sworn before Russell, chairman of the old board. A motion was made to dissolve the meeting. The vote was taken *viva voce*, and declared carried. The result was disputed, and a division of the house demanded. The vote was taken by the show of hands, and again declared carried. A division of the house was again demanded, but refused by the moderator, for the reason that the hand-vote just taken was equivalent to a division of the house ; and the moderator declared the meeting dissolved, and left the chair. Russell, the chairman of the old board, immediately announced that the moderator had vacated the chair, and called for a new election of moderator. A new ballot was taken, resulting in the reëlection of Hill. He took the oath of office again before Russell, when motions were submitted to dismiss the remaining articles, and declared carried, and the meeting was again dissolved.

The old board again called a new meeting for the twelfth of April, the warrant being substantially like that for the meeting of March twenty-seventh, but contained no article for the choice of selectmen. A meeting was held on the twelfth of April, some twenty-five or thirty only of the voters being present. The annual appropriations were made, and the usual town business transacted, and the meeting was then dissolved.

The new board of selectmen, in addition to the acts above recited done by them, made a few appointments to office, and, on the second of April, filed their resignation with the town-clerk. They have not, since that date, attempted to act as selectmen of the town. Russell and Barrett have assumed to hold over, upon the ground that the election on the ninth of March was illegal ; and they have acted as selectmen of the town since, assessing the taxes, making appointments to office, and generally performing the duties that pertain to the office.

Most of the plaintiffs attended the meeting on the twenty-seventh of

March, and took part therein, their purpose being to control the meeting and prevent the old board from obtaining any appropriations from the town. One or two only of the plaintiffs attended the meeting on the twelfth of April, but took no part in the proceedings.

Upon these facts, the petitioners claim that there was no such irregularity in the proceedings on the ninth and tenth of March as would render the election of Spaulding, Richardson, and Whittaker to the office of selectmen illegal; and they contend that the town-clerk should be compelled to record said proceedings in the records of the town.

After the voting for state and county officers had taken place, some confusion seems to have arisen out of the contest, as to whether the representative or selectmen should first be elected. Motions were made in quick succession to proceed under the third and fourth articles, including motions to amend and to reconsider,—upon most of which no vote was taken. The moderator, with the great body of the voters, evidently became confused, and they were unable, in the excitement that prevailed, to see their way out of the labyrinth of questions of order raised by the contending parties. When the meeting voted to use the check-list in balloting for first selectman, the votes already cast were taken from the ballot-box, and the balloting commenced anew. This appears to have been done without objection, and there can be no doubt that the action of the moderator in this respect was correct. But before the balloting was completed, the meeting adjourned to two o'clock in the afternoon. It is this adjournment which the defendant claims was illegal, and rendered void the subsequent proceedings. He sets forth in his answer that, " after a considerable number of ballots had been put into the ballot-box, two motions were made to adjourn, and the vote taken and negatived ; and then a motion was made to adjourn to two o'clock in the afternoon, and this motion was put, and declared carried by the moderator, and the meeting adjourned. No business intervened between the three last motions for adjournment." The record, as made by him, reads thus : " Several motions to adjourn till two o'clock were now made in quick succession, and amid general confusion, one of which was finally declared carried. This motion, and, consequently, the action upon it, being out of order, the adjournment was equivalent to a dissolution of the meeting, and, owing to the irregularity of further proceedings, no official record was kept of them except what related to the counting and recording of the ballots for state and county officers ; and those votes, as counted by the selectmen and town-clerk, were as follows," &c. The defendant thus admits, by his answer, that his record is incorrect. Cushing's Manual of Parliamentary Practice, ed. 1856, Rule 138, is, that "A motion to adjourn is merely ' that this assembly do now adjourn ; ' and if it is carried in the affirmative, the assembly is adjourned to the next sitting-day,—unless it has previously come to a resolution that, on rising, it will adjourn to a particular day, in which case it is adjourned to that day." Rule 139,—"An adjournment without day—that is, without any time being

fixed for reässembling—would, in the case of any other than a legislative assembly, be equivalent to a dissolution." In note to Rule 137, the author says,—" It is commonly said, that a motion to adjourn is always in order; but this is not strictly true. The question of adjournment may, indeed, be moved repeatedly on the same day, yet, in strictness, not without some intermediate question being proposed, after one motion to adjourn is disposed of, and before the next motion is made for adjourning,—as, for example, an amendment to a pending question, or for the reading of some paper. The reason of this is, that, until some other proceeding has intervened, the question already decided is the same as that newly moved."

If the motion first made " to adjourn " had been adopted, its effect would have been to dissolve the meeting—see Rule 139, *supra.* But this the meeting refused to do. If a town-meeting is to be governed by the strict rules of parliamentary law, the motion to adjourn could not be renewed without some intermediate question being proposed. The motion was, however, immediately renewed and entertained by the moderator, without objection,—at least none appears from the evidence, —and was again voted down. No objection being made, all objection to the immediate renewal of the motion must be regarded as waived, which it was entirely competent for the moderator, or the voters, to do. Besides the result of the two votes being exactly alike, the meeting stood, at the end of the second vote, precisely where it stood at the end of the first. No progress in the dispatch of business had been made: the voters had merely said twice instead of once that they would not dissolve the meeting. But such meetings are not suffered to be, nor are they in part governed by the strict rules of deliberative, legislative assemblies. By statute, it is made the duty of the moderator to preside in and regulate the business of the meeting: he may prescribe rules of proceeding, which may be altered by the town; and he must decide all questions of order, and make a public declaration of all votes passed. Gen. Stats., ch. 36, sec. 3. The statute, in fact, invests him with the power of making such rules as he may find necessary for the government of the meeting over which he presides, subject to alteration by the town. These popular assemblies, we may presume, are usually presided over by men of at least average intelligence, but without experience in the intricacies of parliamentary rules; and to compel such presiding officers to govern their meetings according to such rules would inevitably result in very great confusion. However wise or necessary such rules may be for legislative bodies, they are not adapted to the successful or prompt dispatch of business in town-meetings; and the statute therefore wisely allows the moderator a large discretion in prescribing rules for the government of his meeting, subject only to revision by the town. Indeed, no intelligent person would contend, in case the presiding officer of a legislative body should entertain a new motion to adjourn without the intervention of any new question, whether with or without objection, that the legality of the subsequent proceedings of the body could for that reason be questioned,

although he might thereby become obnoxious to censure or removal for disregarding the rules of his house.

After the meeting had twice voted down the proposition to adjourn,—the effect of which would have been to dissolve the meeting and prevent the transaction of any further business under that warrant,—a motion was immediately made to adjourn to two o'clock in the afternoon. No objection was made to entertaining this motion, and it was put and carried, and the meeting accordingly adjourned. This was a different motion from the two previously voted down ; and there can be no pretence that even under the strictest parliamentary rules ever in force, the motion was not clearly in order. There is nothing, then, up to this stage in the proceedings, that can render illegal the action of the meeting. The defendant's act, when he usurped the province of the moderator and undertook to decide that the action of the voters was equivalent to a dissolution of the meeting, was an assumption which has not even a technicality to hang upon. His insincerity at once appears when he undertakes to record the state of the votes thrown for state and county officers " as counted by the selectmen and town clerk,"—which was not done till some time in the afternoon, although he purposely omits to record that the moderator assisted in the count, or made a public declaration thereof. How the meeting could not legally reassemble at two o'clock to complete the other business under the warrant, and could legally assemble to finish voting for state and county officers, and to count and declare the same, is a question which he has not attempted to explain.

Whether the refusal of the clerk to discharge his official duties might not be deemed equivalent to a resignation of his office, it is not necessary to inquire. It is clear, that when the meeting proceeded without objection to the election of selectmen without the check-list, its action was equivalent to a reconsideration of the vote in the forenoon to use it. But however this may be, the defendant had no power to stop the business of the meeting till it suited his notions of order to allow it to be resumed. A subordinate officer, whose duties are simply ministerial, cannot judge for himself whether the rulings of the moderator are correct. As the defendant refused to check, the only way the business could proceed was without the check-list. Whether this could be done in balloting for officers where the law required the list to be used we are not called upon to decide. But no statute compels the use of it in voting for town officers. The objections, therefore, to the validity of Spaulding's election cannot be sustained.

But even if this were otherwise, the vote to use the list was limited by its terms to the election of first selectman. There was nothing, then, to prevent the election of the other two without it ; and in this view the election of Richardson and Whittaker cannot be questioned.

But it is claimed that the moderator alone sorted and counted the votes for selectmen. The provision of the statute is, that the selectmen and town-clerk shall assist in sorting and counting the votes, and that no other person shall in any manner interfere therewith. Gen. Stats.,

ch. 28, sec. 12. This provision is directory merely. To hold otherwise would allow these officers to defeat the election of their successors by refusing to assist in sorting and counting the ballots. Goodwin, Russell, and Barrett testify that they were not requested by the moderator to assist in the count. There is nothing in the statute that makes a request necessary. The votes were sorted and counted in their presence. There was no attempt to prevent their assisting. On the contrary, they admit they refrained because they did not consider the proceedings in the afternoon legal. There is no suggestion that the votes were not correctly counted and declared, nor that every one did not vote who desired ; and there is no proof that any one voted who had not a legal right to vote. The result contended for by the defendant would be subversive of our system of annual elections, and of annual accountability to the people.

The objection to the adjournment at night to the next day must be overruled for the reasons before given. Two motions were made to adjourn, and were voted down, the effect of which was a refusal to dissolve the meeting. The motion was immediately renewed to adjourn. The moderator inquired, "To what time?" It is seriously contended that the moderator could not make this inquiry. The very ground upon which the defendant has assumed to set aside the proceedings of this meeting is, that motions to adjourn were made which were not in order according to the strict rules of parliamentary law. If he is correct, then the third motion to adjourn at night was not in order, and it was not only proper but necessary that the moderator should inquire with a view to bring before the meeting a different proposition from that which had just been twice defeated. In answer to his inquiry three answers were returned ;—one, to adjourn to July 4 ; the second, to nine o'clock P. M ; and the third, to nine o'clock the next forenoon. It is obvious that the last was the only time proposed for the seasonable transaction of the remaining business. Cushing, in his Manual, Rule 87, lays down the rule that the largest sum and shortest time shall be put first : but he says, in a note, that the rule in the United States senate is the largest sum and shortest time, and in the House of Commons, in England, the smallest sum and largest time shall be put first. It is of no consequence, however, what the parliamentary rule is on this point. The moderator by statute could prescribe his own rules, and that he did, by putting to vote the proposition to adjourn to nine o'clock the next morning, without objection. The proposition was carried, and the meeting declared adjourned accordingly. To hold that there was any such irregularity in this as would affect the proceedings of the next day would be " sticking at the bark " rather than regarding the substance of things.

The conduct of the old board of selectmen and of the town-clerk in attempting to defeat the holding of the meeting on the 10th of March, by carrying away the warrant and check-list, and the copies thereof, and the keys of the town-house, was without excuse. It is quite apparent their object was to break up the annual meeting, and prevent

the success of those who did not agree with them. The town-clerk being absent, it became necessary to elect a clerk *pro tempore*. Gen. Stats., ch. 39, sec. 13. No reason appears why Mr. Reed was not legally elected, nor why the record kept by him should not be entered in the records of the town. The defendant fails to show that his absence just over the line of the state during the day was occasioned by necessity; while his withholding the check-list, warrant, and keys of the town-house, in the absence of any explanation, is conclusive evidence that he was conspiring with Russell and Barrett to prevent the transaction of business on the day of the adjournment.

The defendant, and Russell and Barrett, having secured and withheld the check-list and warrant, the meeting was of necessity compelled to proceed without them. No business was done beyond the election of representative and third selectman in place of Blood, declined. No question arises here as to the election of representative. That was adjudicated by the house of representatives in June, whose jurisdiction was exclusive and final. No reason has been shown why the election of Whittaker should be questioned. What, then, was to prevent the new board of selectmen from entering upon and performing the duties of their office? Nothing. And they undertook, for nearly a month, to act in that capacity, and then resigned—for what reason does not appear;—probably because they did not wish to become involved in the litigation and troubles that were then threatening to involve them, and all others who would not acquiesce in the claims put forth by the defendant and his associates.

By statute, Messrs. Barrett and Russell could hold the office of selectmen until the next annual meeting (second Tuesday of March, 1875), and until others should be chosen and sworn in their stead. Gen. Stats., ch. 37, sec. 9. That event happened in the forenoon of March 10, 1875, when Messrs. Spaulding and Richardson, elected on the 9th, were sworn before James Taft, a justice of the peace, and the proper certificate thereof was made by him,—and Mr. Whittaker, elected on the 10th, was sworn in open town-meeting. The term of the old board having ceased when their successors were sworn, it is immaterial whether the new board entered upon their duties or not. It is sufficient if they were sworn. The subsequent resignation of the new board could not have the effect to reinstate the old board. After they had once ceased to hold the office, there was no way, short of a new election, that would give them any claim to the office. The statute points out a plain and practicable way for filling such vacancies. Gen. Stats., ch. 39.

I am compelled, for these reasons, to hold that Messrs. Barrett and Russell ceased to hold the office of selectmen when the new board was sworn in, on the forenoon of March 10, 1875. Since that time they have clearly been usurping the office, and have no more authority or right to hold it than any other two persons in the town of Mason.

Counsel for the defendant contend that the writ ought not to issue because of the serious consequences that must flow from declaring the

doings of the old board void. The consequences that may result from such a step present a question of grave importance, which we are not called upon, at this time, to examine. Very likely the validity of their acts, and of the acts of the officers appointed by them, will be drawn in question. The condition of things in this town is a matter of regret. The collection of taxes is being resisted, suits are springing up, and bad feelings being engendered. But to refuse the relief prayed for would be affording immunity to usurpation, and allowing the elective franchise to be degraded.

In *Bell* v. *Pike*, 53 N. H. 473, it was clearly laid down that " the power of the court, by mandamus, to require the clerk of the town to amend his record so as to make it accord with the facts, upon application of any person who shows a legal right, is not to be disputed. The records are public records ; and when the rights affected by an error in them are of a public character, the writ would generally be granted, as matter of course, upon a proper case being shown *ex debito justitiæ.*" " The applicant must show a clear legal and equitable right, and that there is no other specific legal remedy for its enforcement. * * * The object of granting the writ of mandamus being to prevent a failure of justice, and to provide an immediate and efficacious remedy, it follows that it will not be granted, if when granted it would be nugatory, in accordance with the maxim, *Lex non coget ad inutilia.* * * * So the court will refuse it, if it be manifest that it must be vain and fruitless, or useless, or cannot have a beneficial effect."

To the same point is *Hall* v. *Selectmen of Somersworth*, 39 N. H. 511, where some of the leading authorities are collected by BELLOWS, J.

Applying the rule as thus laid down, it is clear this writ ought to issue. The defendant is a public officer, and the duty in question is a public one, clearly imposed by statute. Gen. Stats., ch. 37, sec. 1. It concerns the due administration of the laws, and it is a matter of the highest importance to the residents and tax-payers of the town, that the officers who assess their taxes, appoint many of their subordinate officers, and in general " manage all the prudential affairs of the town " (Gen. Stats., ch. 37, sec. 2), should be such as are legally elected for that purpose, or at least have a colorable right to the office which they claim to hold. No other adequate and specific remedy exists for correcting the error in the records. The petitioners should not be turned over to the doubtful and insufficient remedy of obtaining an amendment of the records, nor to the expense and delay incident thereto, as a collateral proceeding, in any suit where it may become vital for them to show the defective character of these records.

All the tax-payers of the town are directly interested in having the records express the truth. The testimony taken in this case comes from twenty-eight different witnesses, and covers nearly four hundred pages, and, on many points, is conflicting. It would be a great hardship to compel each inhabitant of this town, who may avail himself of his legal right to resist the acts of these selectmen as illegal, to risk the uncertainty, with the expense and trouble incident thereto, of

obtaining an amendment of these records to conform to the truth, as a collateral proceeding.

The duty of the defendant, as town-clerk, to record the doings of the annual meeting *as declared* by the moderator, is purely a ministerial duty, involving the exercise of no judicial discretion whatever. The appropriate duties of each of these officers, as prescribed by statute, were fully discussed in *Bell* v. *Pike, supra,* and the impracticability, to say nothing of the danger, of allowing the clerk to make his record different from the results as officially announced by the moderator, are there fully considered, and his right so to do most emphatically denied. It is also very clear that neither of these plaintiffs, nor any other person interested, has any right of action given by statute or at common law, except this process to compel the defendant to amend his record conformably to the truth. Unless this suit can be maintained, these plaintiffs must be sent away, with no redress for the wrong of which they complain, while the men who have conspired to prevent the lawful transaction of the business of the town, and have usurped two of its most important offices, will be left undisturbed in the possession thereof.

"If the law requires a certain thing to be done, we may order it to be done by the party upon whom the obligation of doing it is imposed. If he is to act according to his discretion, and he will not act or even consider the matter, we may compel him to put himself in motion to do the thing, but we cannot control his discretion." BEST, J., in *Rex* v. *Yorkshire,* 2 B. & C. 286.

*Carpenter* v. *Co. Commissioners of Bristol,* 21 Pick. 258, is a case very much in point. MORTON, J., said,—"There is no doubt that the petitioner has sought the proper remedy. If this process will not lie, he can have no relief. Mandamus lies to all inferior tribunals, magistrates, and officers, and extends to all cases of neglect to perform a legal duty where there is no other adequate remedy. It applies to judicial as well as ministerial acts. If the duty be judicial, the mandate will be to the officers to exercise their official discretion or judgment, without any direction as to the manner in which it shall be done. If it be ministerial, then the mandamus will direct the specific act to be performed."

*Manning* v. *Fifth Parish in Gloucester,* 6 Pick. 6, was a bill in equity to compel the specific performance of an agreement. The plaintiffs offered parol evidence to supply a deficiency in the parish records. The court held (see p. 16) that this could not be done in that suit, and said, —"If a vote is omitted, the application should be for process to compel the clerk to amend his records."

A mandamus is the proper remedy to compel a ministerial officer to perform a purely ministerial act. *Savage* v. *Holmes,* 15 La. An. 334.

The general rule is, that a writ of mandamus will not lie where an adequate remedy at law exists; but where the remedy by action is *doubtful,* a mandamus will lie. *Clark* v. *Miller,* 47 Barb. 38.

The writ of mandamus is a summary remedy for want of a specific

one, where there would otherwise be a failure of justice. It is based on reasons of justice and public policy, to preserve peace, order, and good government: it is compared to a bill in equity for specific performance, not a writ of right: it is granted not as of course, but only at the discretion of the court to whom the application is made;—and this discretion will not be exercised in favor of applicants, unless some just or useful purpose may be answered by the writ. *State* v. *Graves*, 19 Md. 351 ; High's Ex. Legal Rem., secs. 80–99.

The clerk *pro tempore* is the proper person to record the proceedings of March 10th. He was, for the time being, clerk, standing in the place of the clerk chosen for the year. Gen. Stats., ch. 39, sec. 13.

One further objection remains to be noticed. It is contended that this petition cannot be maintained, because not in the name of the attorney-general. The objection was not taken by plea, nor in the answer, nor until the cause was argued orally. If it is well founded, it must probably be regarded as one of form rather than of substance, and such as can be cured by amendment. High on Ex. Rem., sec. 430; Gen. Stats., ch. 207, secs. 8, 16 ; *Society* v. *Society*, 55 N. H. 463. But, inasmuch as it came too late, and the practical result of our conclusions could not be affected by its decision one way or the other, we have not thought it worth while to consider it.

Cushing, C. J. A very large amount of testimony has been taken in this case, all of which has been attentively read. Before examining the testimony, however, it seems proper to ascertain what, if any, are the points in issue, and to what this mass of testimony is directed.

The first matter, in regard to which the parties are in conflict, is the refusal of the clerk to proceed with checking the names of the voters. It is conceded by both parties that he did refuse, and that the moderator informed the meeting that he had refused. It is conceded that, before any further business was done, the meeting was adjourned to two o'clock in the afternoon of the same day.

The respondent states that three motions were made and put in succession, without any other business intervening between the motions; and, finally, the last motion, which was to adjourn to two o'clock in the afternoon, was carried, and so declared.

The respondent, Mr. Goodwin, says that this proceeding was out of order, and was therefore by him deemed equivalent to a dissolution of the meeting.

I do not understand how what had been done amounted to a dissolution of the meeting. Nothing can be better settled than that every deliberative assembly (and undoubtedly a town-meeting is theoretically and nominally such, however it may be in fact) is and must be the final judge of its own parliamentary law. No doubt the ordinary rules of parliamentary law, as laid down in the manuals and books of authority, are a very convenient aid to the orderly transaction of business; but its rules are in many matters complicated, and the distinctions subtle and nice ;—and when the various champions of discus-

sion engage in a game of parliamentary tactics, a town-meeting would very soon find itself entangled in the complicated meshes of parliamentary rules, which would effectually stop all proceedings, and bar all legitimate action, if they were of any binding force.

All this, however, avails nothing against the omnipotence of a deliberative assembly. The moderator, excepting in those matters where he is bound by statute law, rules as he understands that he ought to rule. If his ruling is incorrect, any person who is dissatisfied may appeal to the meeting, and its decision, being not against the statute, is final and conclusive. There is not in the petition, or in the answer, any allegation of fraud. There is nothing charged in the one or the other inconsistent with the idea that both the moderator and the clerk were, in good faith, doing the best they could. Whether, therefore, it was or was not agreeable to parliamentary rules that motions to adjourn without day should be put and denied, and then a motion to adjourn to a time certain put and carried, without any intervening business, is entirely immaterial. Nobody appealed from those rulings of the moderator, and there is no reason to doubt that the sense of the meeting was really ascertained and declared, and there was not the least reason to doubt that if it had been called upon to pass upon the rulings of the moderator, they would have been sustained.

The meeting, then, was regularly and properly adjourned in the forenoon of the first day, and duly assembled in the afternoon.

From the allegations in the pleadings, it is apparent that it was known by this time to the meeting that the clerk had in the morning declined to check the names, and it was also known to the meeting that the moderator was proceeding to take the votes for first selectman without using the check-list. It is not, I believe, alleged that any objection was made by anybody to this mode of voting. It is alleged by the respondent that individuals refused to take part in what was going on, and claimed that the proceedings were illegal; by which I understand that they considered that what they supposed to be an irregular adjournment had dissolved the meeting, and they apparently did not think it worth while to interfere any further in what was going on. It is alleged in the petition, that the moderator, before proceeding to take the votes in the afternoon, informed the meeting that he should turn out the ballots which had been cast in the forenoon, and did so. This fact is not denied in the answer, and is not in issue. The contradictory evidence on the point is, therefore, quite immaterial. It appears that, out of one hundred and fifty-two voters on the state ticket, one hundred and thirty voted for first selectman,—a large majority, which could easily have passed a new vote and taken a different order if it had been thought desirable. I think, therefore, that the town-clerk having once refused to check, and then one hundred and thirty voters after the adjournment having acquiesced in voting without the check-list, it is too late now to deny the legality of that vote.

As no vote was passed to use the check-list except in voting for the first selectman, the other voting was regular.

It ars to me, also, that the adjournment to the next day, at 9 o'clo as well enough, whether on the showing of the petitioner, or of th pondents. It is clear, according to either statement, that it was t ense of the meeting to adjourn to a day certain, and not to adjou ithout day. It is, I think, not at all unusual, when a motion has b put, which, by mistake or accident, is likely to be of no con- seque to suggest an amendment, which is made by some one sug- gestin addition to the motion. It may not have been strictly par- liamen y for the moderator to proceed as he did ; but the meeting having ice, according to the answer, refused to adjourn without day, there i ttle reason to doubt that, if the moderator had put the mo- tion to djourn to the 4th of July first, that motion and the motion to adjo n till nine o'clock that night would have been voted down, and the otion to adjourn till the next day, at 9 o'clock, would have been ca ed. There is no reason to doubt that the large majority of that me ing were in earnest, and did not intend to lose their annual meeting, It may be remarked, also, that if the first adjournment did amount a dissolution of the meeting, it would have been idle to state the otes for state and county officers in the afternoon. It shows, plainly e ugh, that the malcontents themselves had not entire faith in their sition. It appears to me, therefore, that, taking the allega- tions in t e petition and the answer together, and without considering the evide e at all, it is apparent enough that there was no illegality which oug it to vitiate the doings of the meeting so far. No business was transe.cted on the next day, which required the use of the check- list, excepting the choice of representative ; and the house of repre- sentatives has already relieved the case from any difficulty on that ac- count, and condoned the error, if there was one.

I should think, then, that the town-clerk ought to amend this record.

The matters in regard to which any issues of fact are made, appear to be really quite immaterial ; and as the respondent expresses his will- ingness to make up the record under the direction of the court, I see no reason why he should not be ordered to do it. He states, in his answer, correctly, all the material portions of the doings of the meet- ing that afternoon, and I think the court would have no difficulty in ordering him to make such a record as would show the proceedings and their validity during the afternoon of that day. And I think this may be done on the statements and admissions of the petition and an- swer, with no aid from external evidence, excepting, simply, proof of the number of votes cast, and the persons for whom, at those ballot- ings. The town-clerk *pro tempore* ought also to be permitted to make up the record, in the town book, of the second day's proceedings.

An immense mass of testimony has been taken, every word of which I have read with care, and a large portion of it more than once. It is not agreeable reading. It is probable that in a confused town-meeting it would be difficult to find two men who would see the same things, and see them alike. It is equally certain that few would see accu- rately. There would of course be many contradictions, and still more

unintentional softening down on the one side, and exaggerating on the other, what took place. It is not strange, therefore, that there should be many contradictions.

I feel satisfied, however, that enough appears to make it pretty evident that the malcontents of that day were excited enough to be willing to resort to mean and desperate measures to retain the advantage they supposed they had gained. It is not an agreeable phase of humanity which is exhibited. If, however, what I have said so far is true, the evidence is mostly irrelevant. The truth of the matters on which the legality of the first day's work depended is apparent from the petition and answer.

This proceeding is not a *quo warranto*. We are not trying any one's right to an office, but simply determining whether a mandamus should issue to correct and complete a record.

I do not therefore feel called upon to undertake to form or express any opinion in regard to the official capacity of the persons who have been acting as selectmen. An opinion expressed in this proceeding, in which those matters are not, as I understand, in issue upon the pleadings, would be of no binding force upon anybody; and if ever the matter should be drawn into controversy, the evidence may appear very differently from what it does now, especially if it should take the form of oral testimony before a jury.

LADD, J., concurred.

*Peremptory mandamus issued.*